UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARAH FALL and
STEVEN FALL,

       Plaintiffs,

v.                                 Case No. 07-10480
                                 Hon. Sean F. Cox

MNP CORPORATION,
OVIDON MANUFACTURING, L.L.C.,
and RICK VELLA,

       Defendants.

_____

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment.  Both

parties have briefed the issues and a hearing was held April 10, 2008.  For the following reasons,

the Court **GRANTS** in part, and **DENIES** in part, Defendants' Motion for summary judgment.

Defendants' Motion is granted with respect to Plaintiff's claims: (1) against MNP Corporation;

(2) of disparate treatment in violation of Title VII and the ELCRA; (3) of retaliation in violation

of Title VII and the ELCRA; and (4) hostile environment in violation of the ELCRA.  Based on

the evidence presented, Defendants' Motion is denied with respect to Plaintiff's claim of a

hostile environment in violation of Title VII.

## I.    BACKGROUND

This action arises out of alleged employment discrimination.  Plaintiffs are Sarah Fall and

her husband Steven Fall.[1]  Defendants are MNP Corporation ("MNP"), Ovidon Manufacturing, LLC ("Ovidon"), and Rick Vella ("Vella").

Ovidon designs and manufactures "progressive, blank, line, and compound tooling...and prototypes, EDM, water jet, production metal stampings, and assemblies for the automotive industry."  MNP manufactures high volume fasteners for automotive and tier-1 customers.  Ovidon is located in Howell, Michigan, while MNP is located in Utica, Michigan.  Ovidon and MNP became affiliated in April 2006.  The parties dispute the level of interrelatedness between the two companies.

On approximately July 11, 2005, Plaintiff was hired on a part-time basis as a Manufacturing Information Systems ("MIS") Manager.  She was hired by Mike Staddon, the Vice-President and General Manager of Ovidon, but claims that the IT Director of MNP also played a role in the hiring process.  Plaintiff claims she was supervised both by Staddon and MNP employee Jim Racine.  However, Ovidon directed Plaintiff's daily activities and paid her wages.  During her employment, Plaintiff attended classes to earn her bachelor's degree.

One evening in August 2005, Plaintiff alleges she stayed late and noticed that Staddon had also stayed late.  She went to his office to ask him something and inadvertently observed Staddon and his assistant Mary-Ann Grimes ("Grimes") in an intimate embrace.  The next day Staddon called Plaintiff into his office to try and explain, to which she replied no explanation was necessary and she did not want to be involved.  Plaintiff claims that after witnessing Staddon and Grimes' embrace, they began to retaliate against her.  Plaintiff asserts meeting times were

---

[1]Plaintiff Steven Fall asserts a claim for loss of consortium, he is not involved in the remaining claims.  Accordingly, "Plaintiff" as used in this opinion refers only to Plaintiff Sarah Fall.

changed to when she had class so she could not attend. She also claims that she called Grimes reporting she was ill and had smelled exhaust fumes in her office. Plaintiff alleges that Grimes laughed at her and failed to send help. Plaintiff was diagnosed with acute carbon monoxide poisoning. Plaintiff did not report the alleged retaliation at that time.

On December 6, 2005, despite the alleged harassment, Staddon offered Plaintiff full-time employment. Plaintiff accepted.

In January 2006, Defendant Rick Vella replaced Staddon as the Vice-President and General Manager of Ovidon. Plaintiff reported to Vella. On January 12, 2006, Plaintiff made a formal complaint to Vella of the alleged retaliation and harassment from Staddon and Grimes. Ovidon commenced an investigation the following day. Vella contacted Randy Allison, the human resources manager at MNP, to conduct the investigation. Defendants claim they could not substantiate Plaintiff's allegations and no corrective action was taken. Plaintiff claims that after making her complaint, Vella began to harass her as well.

Plaintiff claims she was denied training opportunities she was promised. She also alleges that Vella stared at her aggressively, raised his voice and generally tried to intimidate her. Plaintiff also claims Vella made several gender biased remarks to other female employees. Plaintiff further claims women were denied the opportunity to go on business trips, and that she was prevented from hanging cable as required by her job because Vella preferred to have a man do it.

Even in light of the alleged harassment, Vella approved Plaintiff for short-term disability benefits and Family and Medical Leave Act time to which she was not entitled because she had not been employed for one year. On June 12, 2006, Plaintiff took a medical leave of absence.

Her physician ordered that she remain off work through July 31, 2006.

On June 24, 2006, Plaintiff attempted to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). As part of the process, Plaintiff completed an intake questionnaire. The intake questionnaire asked Plaintiff to list how she was discriminated against, including the harm and the persons who caused it. Plaintiff listed three incidents: (1) walked in on Staddon and Grimes in an embrace; (2) Staddon retaliated against her; and (3) on January 14, 2006 she filed an official complaint with her new supervisor Vella and MNP, she lists Vella and MNP as the parties responsible. The intake questionnaire also alleged that after making a complaint about Staddon and Grimes, Vella denied her the opportunity to go to training that she claims she needed. Plaintiff claims that the guys got to go because "it's a man's world." In response to the intake questionnaire, the EEOC wrote Plaintiff a letter stating that it did not document the charge because it found Plaintiff had not suffered an adverse employment action.

During her medical absence, Plaintiff went to Ovidon's office several times. At her last visit, Plaintiff claims she told Vella that she would need "some extra time" before she could return to work in order to seek "some medical testing." Plaintiff alleges she told Vella she would be back within two weeks of when she was medically allowed to return to work. Plaintiff did not report to work on August 1, 2006, the date her physician cleared her to return. Her employment was terminated.

On October 28, 2006, Plaintiff refiled her charge of discrimination with the EEOC. The EEOC charge alleged that the discrimination took place from August 1, 2005 through January 14, 2006. Plaintiff alleged her "supervisors" subjected her to "intimidation, harassment, retaliation, and unequal wages" due to her gender. She claims she was denied "opportunities for equal pay,

4

advancement, training, and other opportunities, terms and conditions of employment subjecting

me and other female employees to degrading, demeaning, humiliating and offensive treatment,

statements and conduct directed toward women." Plaintiff asserted that her "ultimate

supervisor" stated that "it's a man's world, if you don't like it leave." However, Plaintiff did not

identify who she was referring to as her "ultimate supervisor." Plaintiff claims that because of

the stress she experienced she was "taken off work," presumably referring to her medical

absences, and was terminated as a result.

On January 31, 2007, Plaintiff filed a Complaint. An Amended Complaint was filed

March 5, 2007 alleging: (1) disparate treatment based on gender discrimination in violation of

Title VII; (2) retaliation in violation of Title VII; (3) disparate treatment based on gender

discrimination in violation of the Elliott-Larsen Civil Rights Act ("ELCRA"); (4) retaliation in

violation of the ELCRA; (5) sexually hostile environment in violation of Title VII; and (6)

sexually hostile environment in violation of the ELCRA. On January 10, 2008, Defendants filed

the instant Motion for Summary Judgment.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).

A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have

[the] effect of establishing or refuting one of the essential elements of the cause of action or

defense asserted by the parties, and would necessarily affect application of appropriate

principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).  The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### III.    ANALYSIS

As a preliminary matter, Defendants argue Plaintiff's claims should be dismissed for failure to exhaust her administrative remedies.  Defendants point out that Plaintiff did not identify Vella as her harasser in her EEOC charge. [Defendants' Exhibit 30].  Further, the EEOC charge states that the discrimination occurred from August 1, 2005 through January 14, 2006, however, most of Plaintiff's allegations in this action relate to Vella.  Vella started working for Ovidon in January 2006.  Much of the harassment alleged by Plaintiff occurred after January 2006.

"A person seeking to bring a discrimination claim under Title VII in federal court must first exhaust her administrative remedies." *Randolph v. Ohio Department of Youth Services*, 453 F.3d 724, 731 (6th Cir. 2006).  "This requirement exists so that the EEOC will have an opportunity to convince the parties to enter into voluntary settlement, which is the preferred means of disposing of such claims." *Id.*  "The requirement, however, is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading." *Id.* at 732.  "As a result, the EEOC complaint should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Id.* (citation omitted).

Defendants point out that the EEOC charge limits the discriminatory action to events between August 1, 2005 and January 14, 2006. Defendants also argue that Plaintiff does not identify Vella in the charge. Plaintiff argues that the intake questionnaire included allegations against Vella.

The general rule in the Sixth Circuit is that "the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004). "[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Id.* In *Russell v. Bronson Heating and Cooling*, 345 F.Supp.2d 761 (E.D.Mich. 2004), the court held that incidents recited in the intake questionnaire could be considered as part of the charge. In *Russell*, the plaintiff's EEOC charge limited the earliest date of discrimination to August 10, 2002. However, when the plaintiff completed the intake questionnaire, she also included a written complaint that listed several incidents prior to August 2002. The court relied on the principal that the EEOC Charge "should be liberally construed to encompass all charges reasonably expected to grow out of the charge of discrimination." *Russell*, 345 F.Supp.2d at 777 (citing *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992). The court also noted that the charges are filed by lay complainants. *Id.* The court held that since the plaintiff recited incidents of harassment in her intake questionnaire, to bar her claim based on a procedural technicality would be contrary to the spirit of the decision in *Haithcock*. *Id.* Thus, the court allowed plaintiff to go forward on the claims alleged in the intake questionnaire.

The Supreme Court also ruled recently that the EEOC's determination that an intake

questionnaire along with an affidavit, without more, could constitute a charge was a reasonable exercise of its authority. *Federal Express Corporation v. Holowecki*, 128 S.Ct. 1147 (2008). In *Holowecki*, the Court upheld a rule by the EEOC that a filing is deemed a charge if the document reasonably can be construed to request agency action and appropriate relief on the employee's behalf. *Id.* at 1159. The Court held:

> Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies. Construing ambiguities against the drafter may be the more efficient rule to encourage precise expression in other contexts; here, however, the rule would undermine the remedial scheme Congress adopted. It would encourage individuals to avoid filing errors by retaining counsel, increasing both the cost and likelihood of litigation.

*Id.* at 1160.

In this case, Plaintiff's charge of discrimination alleges that her "supervisors" subjected her to "intimidation, harassment, retaliation, and unequal wages" based on her gender. [Defendants' Exhibit 30]. Plaintiff also quotes allegedly discriminatory and harassing language used by her "ultimate supervisor." *Id.* Plaintiff alleges that these actions interfered with her ability to perform her job duties and functions. *Id.* Plaintiff claims that in March and June 2006, obviously after January 2006, the "**continuing** and intensified stress at work caused by sexual discrimination and retaliation" caused her to take medical leaves. *Id.* (emphasis added). This is sufficient information to reasonably expect the EEOC will investigate matters beyond January 2006. Additionally, Plaintiff's intake questionnaire specifically referenced Vella and his alleged denial of opportunity to train, etc. Accordingly, Plaintiff exhausted her administrative remedies.[2]

---

[2]Coincidentally, the EEOC issued a right to sue letter on January 3, 2007, indicating that it would not be able to complete its administrative processing within 180 days from the filing of the charge. Thus, whether the information listed in the charge and intake questionnaire gave the

### A.    Was MNP Plaintiff's Employer?

Plaintiff alleges that MNP is the parent company of Ovidon. [Amended Complaint, ¶2], and that Ovidon and MNP are "joint adventurers." *Id.* at ¶5. With respect to Plaintiff specifically, she alleges that she was an employee of both Ovidon and MNP and had "employment responsibilities" to both. *Id.* at ¶1. Defendants concede they are "closely-affiliated companies" but deny that MNP and Ovidon have a parent-subsidiary relationship. Defendants assert, and Plaintiff does not offer evidence to the contrary, that MNP does not have any direct ownership interest in Ovidon. Defendants argue that MNP cannot be held liable as an employer of Plaintiff.

Although a direct employment relationship usually provides the basis for liability in discrimination actions, courts have fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be considered an "employer." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997). "In one approach, courts examine whether two entities are so interrelated that they may be considered a 'single employer' or an 'integrated enterprise.'" *Id.* "In another approach, courts consider whether one defendant has control over another company's employees sufficient to show that the two companies are acting as a 'joint employer' of those employees." *Id.*[3]

The parties agree that Ovidon was Plaintiff's direct employer, but dispute whether MNP may also be held liable as Plaintiff's employer. Both parties interchangeably refer to an

---

EEOC sufficient notice of the basis for the claims now alleged is of no moment because it did not complete an investigation anyway.

[3]The *Swallows* court also defined a third approach, relying on agency principles. Neither party alleges an agency existed, thus this approach is not considered.

"integrated enterprise" and "joint employers." Accordingly, the Court will address Plaintiff's allegations under both doctrines.

### 1.     Integrated Enterprise

The integrated enterprise, or single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise. *Swallows*, 128 F.3d at 993. "In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Id.* at 993-994. "None of these factors is conclusive, and all four need not be met in every case." *Id.* at 994.

Taking these factors in turn, the first factor is whether there is an interrelation of operations. Plaintiff relies on the deposition testimony of Carolyn Reed. She testified that from her perspective MNP bought Ovidon. [Plaintiffs' Exhibit N, pp.7-8]. Reed claims that Ovidon's accounts payable were entered into MNP's computer system and MNP paid the bills. She also testified that Gerald Lorenz, an MNP employee, came to Ovidon monthly to "go through and get the figures, the sales figures and inventory and things like that." *Id.* at 67. Ovidon also switched to using MNP's payroll and benefits provider. *Id.* at 95 and 97. Reed also testified that she made monthly reports regarding inventory to Lorenz, and provided him daily sales reports. *Id.* at 98.

Defendants do not dispute Reed's assertions. Rather, Defendants argue that MNP's involvement in Ovidon's financial aspects is not enough to demonstrate control over the conditions of employment.

In *Swallows*, the court found there was insufficient evidence of interrelation because the two companies kept their own records, maintained separate bank accounts and separate offices. *Swallows*, 128 F.3d at 994. Here, there is no evidence that Ovidon and MNP have common offices, equipment, or bank accounts. There is evidence that they have common records with respect to accounts payable and that MNP receives regular reports and regularly monitors sales and inventory.

The second factor is common management, directors or boards. There is no evidence that MNP and Ovidon have common management, directors or boards. Ovidon and MNP employed separate IT managers. Moreover, Plaintiff does not dispute that Ovidon directed her day-to-day activities. [Defendants' Statement of Facts Not in Dispute, ¶6; and Plaintiffs' Counter-Statement of Facts Not in Dispute, ¶6]. Plaintiff does offer evidence that MNP Executive Holdings, LLC and MNP Management Holdings, LLC have a combined 30% interest in Ovidon. [Plaintiffs' Exhibit E]. However, these are separate entities and Plaintiff does not offer any evidence to support disregarding their separate business forms. Additionally, in *Swallows*, the court held that one company's ability to influence the management of the other company is insufficient to demonstrate common management for purposes of the integrated enterprise doctrine. *Swallows*, 128 F.3d at 994.

The third factor is centralized control of labor relations and personnel. Plaintiff does not identify any evidence that MNP had the ability to hire and fire employees at Ovidon, or that MNP promulgated employee policies for Ovidon employees. While Plaintiff does allege that Jim Racine, the IT director for MNP interviewed her along with Staddon from Ovidon, she does not allege that Racine or MNP had any decision making authority. Plaintiff also alleges she reported

to Racine in addition to Staddon and Vella, but she does not allege that Racine or MNP had the authority to fire her. Further, her paychecks came from Ovidon. In *Swallows*, the court held that evidence that one company has "a voice in certain employment decisions" was insufficient to establish that it controlled those decisions. *Swallows*, 128 F.3d at 995. The only evidence that supports Plaintiff's position is that when she complained to Vella, Vella called Randy Allison at MNP to investigate. However, Plaintiff does not offer evidence that Ovidon and MNP had centralized labor relations or personnel. There is no evidence that Ovidon did not maintain a separate human resource department.

The fourth factor is common ownership or financial control. There is no evidence of common ownership between Ovidon and MNP. Plaintiff does offer evidence that MNP Executive Holdings, LLC and MNP Management Holdings, LLC have a combined 30% interest in Ovidon. [Plaintiffs' Exhibit E]. But, as stated above, these are separate entities and Plaintiff does not offer any evidence to support disregarding their separate business forms. Plaintiff also does not offer evidence of financial control. Defendants apparently concede that MNP tracks and pays the accounts payable, but there is no evidence it controls the expenditures of Ovidon, that it sets the wages for Ovidon employees, or that Ovidon is a sham corporation. "If neither of the entities is a sham then the fourth test is not met." *Swallows*, 128 F.3d at 995 (citation omitted).

Based on the evidence presented, Plaintiff cannot establish that Ovidon and MNP are a single employer or integrated enterprise for purposes of Title VII liability.

### 2. Joint Employers

"The basis of the joint employer finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of

the terms and conditions of employment of the employees who are employed by the other

employer. Thus, the 'joint employer' concept recognizes that the business entities involved are

in fact separate but that they *share* or co-determine those matters governing the essential terms

and conditions of employment." *Swallows*, 128 F.3d at 993 (citation omitted)(emphasis

original). The Sixth Circuit has not ruled on a case deciding whether parties are common-law

joint employers for purposes of Title VII liability. Nonetheless, the court has provided guidance

through National Labor Relations Board ("NLRB") cases.[4] In *W.W. Grainger, Inc. v. NLRB*, 860

F.2d 244, 247 (6th Cir. 1988), the court stated that the factual question of whether two employers

are joint depends on factors such as "the supervision of the employees' day-to-day activities,

authority to hire or fire employees, promulgation of work rules and conditions of employment,

work assignments, and issuance of operating instructions."

Plaintiff does not dispute that Ovidon directs her day-to-day activities. [Defendants'

Statement of Facts Not in Dispute, ¶6; and Plaintiffs' Counter-Statement of Facts Not in Dispute,

¶6.] Plaintiff does claim that she had to report to Racine at MNP, but does not identify how

frequently she had contact or whether he had any control over her assignments. Plaintiff does not

offer any evidence that MNP had the authority to: hire or fire Ovidon employees; promulgate

work rules and conditions of employment; control work assignments; or issue operating

instructions. Thus, Plaintiff fails to establish a question of fact regarding whether MNP was a

joint employer with Ovidon such that they share in matters governing the essential terms and

---

[4]"Both the 'single employer' and 'joint employer' concepts developed in the labor
relations context, ... and were subsequently imported into the civil rights context. Thus [courts]
look to both labor cases and civil rights cases for guidance." *Swallows*, 128 F.3d at 993, n.3
(citations omitted).

conditions of Plaintiff's employment.

Accordingly, Defendant MNP is entitled to summary judgment on Plaintiff's claims because it was not her employer for purposes of Title VII or the ELCRA.

## B.    Disparate Treatment

Plaintiff alleges she was discriminated against on the basis of her gender in violation of Title VII and the ELCRA.[5]  In order to establish a gender discrimination claim based on disparate treatment relying on circumstantial evidence, the plaintiff must satisfy the familiar *McDonnell Douglas*[6] burden-shifting framework.  Plaintiff has the burden of proving a prima facie case of discrimination; if a prima facie case is established the defendant may rebut it by showing a legitimate nondiscriminatory reason for its actions; if defendant is successful, the plaintiff must then show that the defendant's proffered reason is just a pretext for discrimination.  *Scales v. J.C. Bradford and Company*, 925 F.2d 901, 907 (6th Cir. 1991).

To establish a prima facie case of gender discrimination Plaintiff must show: (1) she is a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably.  *Vincent v. Brewer Company*, 514 F.3d 489, 494 (6th Cir. 2007).  In order to demonstrate an employee is similarly situated the plaintiff does not need an exact correlation with the employee receiving more favorable treatment, rather the plaintiff must demonstrate the employee whom the plaintiff seeks

---

[5]"Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."  *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007). Therefore, this Court will provide one analysis for Plaintiff's Title VII and ELCRA claims.

[6]*McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

to compare herself to is similar in all of the relevant respects.  *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004).

Plaintiff alleges that the first three elements are satisfied and with regard to the fourth element argues only that she was treated differently than similarly situated male employees.  However, Plaintiff fails to establish a prima facie case on the argument she asserts.  Plaintiff only argues the "similarly situated" prong of the fourth element.  While she claims she was treated differently and cites several incidents where she claims she and other female employees received disparate treatment from male employees in general, she fails to identify any male employees to whom she was similarly situated.  At the hearing, Plaintiff argued she was treated differently than a "Mr. Droomer."  But, Plaintiff did not identify how she was similarly situated to "Mr. Droomer" in any relevant respect, or how she was treated differently from him.

However, Plaintiff testified in her deposition that she was replaced by a male employee named Ken Nease. [Plaintiffs' Exhibit A, pp.185-187].  This is sufficient to establish the fourth prong of the prima facie case.

At the hearing, Plaintiff argued for the first time that the adverse employment action she relies on for her disparate treatment claim is constructive discharge rather than termination.  Plaintiff's argument is unsupported.  "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit."  *Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999).  "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined."  *Id.*  "Intent can be shown by demonstrating quitting was a foreseeable consequence of the

employer's actions." *Id.* Additionally, "[t]he plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." *Id.*

Plaintiff testified in her deposition that she planned to return to work after she got more medical tests. [Response, Exhibit A, p.186]. She does not allege that she believed Defendants wanted her to quit, that the harassment she alleged was intended to produce that result, or even that she in fact quit rather than was terminated. Plaintiff does not present any evidence to establish constructive discharge.

Nonetheless, even if Plaintiff established a prima facie case based on Defendants admitted termination of Plaintiff, she fails to establish that Defendants' legitimate nondiscriminatory reason for the termination was pretext for discrimination. Plaintiff's physician cleared her to return to work after July 31, 2006. Plaintiff did not report to work on August 1, 2006 and, according to Defendants, was terminated as a result. Plaintiff does not deny this, arguing only that she had previously told Vella that she would need some more time off for "further medical tests." Defendants were not obligated to give her any more time off.

Plaintiff does not address Defendants' reason for her termination. Plaintiff does not direct the Court to any evidence that her termination was motivated by gender. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims for disparate treatment.

### C. Retaliation

Like a disparate treatment claim, a retaliation claim based on circumstantial evidence uses the *McDonnell Douglas* burden-shifting framework, *supra*. To establish a prima facie case of unlawful retaliation under Title VII, the plaintiff must demonstrate that: (1) she engaged in

activity that Title VII protects; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *Abbott v. Crown Motor Company, Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

Plaintiff alleges in her Complaint that she was retaliated against because she sent an email to Vella on January 14, 2006. According to Plaintiff, her email letter objected to "retaliation, harassment and discrimination against her, both based on unequal treatment of her as a female and because she inadvertently witnessed her direct supervisor in an intimate physical embrace with his female assistant." [Amended Complaint, ¶39]. At the hearing, Plaintiff also alleged that she complained of sex discrimination at a meeting with Vella shortly after she sent the email.

The email letter Plaintiff refers to that she sent to Vella does not allege that she was harassed on the basis of her sex. [Plaintiffs' Exhibit G]. The email only mentions her witnessing Staddon and Grimes in an intimate embrace as the reason for the alleged harassment. Plaintiff does not direct the Court to any deposition testimony or other evidence demonstrating that she told Vella the harassment she alleged from Staddon and Grimes was on the basis of her sex.[7] The only evidence submitted by Plaintiff is Vella's testimony. Plaintiff allegedly asked Vella for a raise when he started at Ovidon, and Vella claims he looked into it and met with Plaintiff to explain why she was not eligible for a raise. [Response, Exhibit B, pp.50-51]. Vella testified that after he denied her request for a raise Plaintiff said that she hoped he was not "just like Mike [Staddon]." *Id.* Vella asked her what she meant and although he could not recall her exact

---

[7]There is no evidence that Defendants were aware of her EEOC charge prior to her termination.

words, he testified that she said something to the effect of "Mike [Staddon] did not give the ladies a fair opportunity."  Plaintiff does not offer any evidence that she told Vella she was being harassed on the basis of her sex, and the statement that Staddon did not give the ladies a "fair opportunity," is too vague to support Plaintiff's retaliation claim.

Based on the evidence presented, Plaintiff's only complaints of harassment to Vella pertained stemmed from her witnessing of Staddon and Grimes' embrace, thus, her complaint was not protected activity under Title VII.  "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII." *Johnson v. University of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Conduct that is protected by Title VII includes, but is not limited to: (1) complaining about allegedly unlawful practices; (2) refusing to obey an order because the worker thinks it is unlawful under Title VII; and (3) opposing unlawful acts by persons other than the employer. *Id.* "Title VII does not prohibit all verbal or physical harassment in the workplace," it only prohibits discrimination on the basis of membership in a protected class. *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000).  An action under Title VII does not lie where the harassment is motivated by personal displeasure or belligerence, rather than discriminatory animus. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000).

"Personal conflict does not equate with discriminatory animus." *Id.*  The evidence presented by Plaintiff does not demonstrate that the harassment she alleged was based on anything more than a personal conflict between herself and Staddon and Grimes.  Thus, her complaint about this alleged harassment to Vella is not protected activity under Title VII. Accordingly, Plaintiff does not establish a prima facie case of retaliation, and Defendants are

18

entitled to summary judgment.

In addition, even if Plaintiff did establish a prima facie case of retaliation, it is unclear what adverse employment action she claims to have suffered as a result. To the extent that Plaintiff relies on her termination, as discussed above, Plaintiff fails to show that Defendants' legitimate nondiscriminatory reason for her termination was pretext.

### D.    Hostile Environment

Plaintiff alleges she was subjected to a hostile environment based on sex discrimination. "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment." *Clark v. United Parcel Service, Inc*., 400 F.3d 341, 347 (6th Cir. 2005). To establish a prima facie case of hostile work environment based on sex, a plaintiff must show: (1) she is a member of a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable. *Id.*

"A hostile work environment occurs 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman,* 220 F.3d at 463 (citing *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993)). The conduct must be severe or pervasive enough that a reasonable person would find the environment hostile or abusive; and the victim must subjectively regard the environment as hostile or abusive. *Id.* The court looks at the totality of the circumstances to determine if the alleged harassment is severe or pervasive, because isolated incidents, unless extremely serious, do not amount to discriminatory changes in the terms and conditions of employment. *Id.* "Appropriate factors for

the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

An employer is strictly liable for an actionable hostile work environment created by a supervisor with immediate authority over the employee. *Clark*, 400 F.3d at 348. However, if the harassment did not result in a negative tangible employment action, the employer has an available affirmative defense. *Id.* "A tangible employment action constitutes significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. "To avail itself of the affirmative defense, the employer must show by a preponderance of the evidence that (a) 'the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808 (1998)). "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Under the ELCRA, the Michigan courts apply the same first four elements of a prima facie case, but decline to make employers strictly liable for a supervisor's creation of a hostile environment. Under Michigan law, the fifth factor the plaintiff must establish is respondeat superior. Thus, an employer may avoid liability for creation of a hostile environment if "it

adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 312 (2000). "The bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some *fault* on the part of the employer." *Id.* (emphasis original). "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Id.* at 319. "[T]he relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff." *Id.*

### 1. Elements One, Two and Three - Was Plaintiff Sexually Harassed?

Defendants do not dispute the first element, that Plaintiff belongs to a protected class. However, Defendants dispute the second and third element with respect to the alleged harassment by Staddon and Grimes because they assert that any alleged harassment was not based on Plaintiff's sex, but on personal animosity. As discussed above in the context of Plaintiff's retaliation claim, Plaintiff fails to adduce any evidence that the alleged harassment by Staddon and Grimes was based on her sex versus on her witnessing them in an embrace. Thus, the harassment allegedly committed by Staddon and Grimes is not considered for purposes of this claim.

Defendants also assert there is no evidence that two of the comments purportedly made by Vella were based on Plaintiff's sex. However, the Court does not consider these two comments in a vacuum. While the two comments plucked out by Defendants do not appear to have a gender biased connotation, other comments allegedly made by Vella clearly do. Plaintiff

21

presents evidence that Vella stated to a co-worker, Carolyn Reed, that "it was a man's world, and if women didn't like it, they could leave." [Plaintiffs' Exhibit A, p.47].[8] Plaintiff also testified that Vella told Reed that in her handling of a suicidal female employee, "what she should have done was gave the woman a gun and let her shoot herself...[t]hat's how you handle a woman like that." [Plaintiffs' Exhibit A, p.48]. Plaintiff further testified that Vella told her that if she could not do her job he would replace her with a male contractor and "it would be over." [Plaintiffs' Exhibit A, p.49]. Taking the evidence and drawing inferences in Plaintiff's favor, Plaintiff was subjected to unwelcome harassment on the basis of her sex.

Moreover, Plaintiff does not have to establish that each incident of harassment she relies on explicitly refers to her sex. In *Williams v. General Motors Corporation*, 187 F.3d 553, 565 (6th Cir. 1999), the court held that "harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." The court held that harm "based on sex" could be used to establish a hostile environment claim where the harm would not have occurred but for the fact of the victim's sex. *Id.* Plaintiff establishes the second and third elements of her prima facie case because she alleges the harassment she suffered was on the basis of her sex and several of the incidents of harassment she relies on explicitly refer to sex.

### 2. Element Four - Severe and Pervasive

[8]Contrary to Defendants' argument, a plaintiff may introduce evidence of incidents of sexual harassment not directed at the plaintiff as evidence of a hostile environment. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008). "[The court] may consider evidence of other acts of harassment of which a plaintiff becomes aware during the period of his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence." *Id.* at 335. Plaintiff testified that she became aware of both comments made to Reed while she was employed by Defendants. [Plaintiffs' Exhibit A, pp.47-48].

Defendants argue Plaintiff does not establish that the alleged harassment was severe and pervasive enough to create a hostile environment. As discussed above, the harassment allegedly inflicted by Staddon and Grimes is not considered, Plaintiff's only other allegations are against Vella, Plaintiff testified:

- Vella would answer her questions in an "intimidating manner," he would "raise his voice" and wanted to "scare" her; [Plaintiffs' Exhibit A, pp.32-33].

- Vella would "crowd" her and Reed in order to get a point across; *Id.* at 34-36.

- Vella threatened her and threatened her job; *Id.* at 34.

- Vella also raised his voice at three other female employees; *Id.* at 36.

- Vella had also threatened the jobs of two female and one male employee; *Id.* at 36-37.

- Vella told a female co-worker that it was not appropriate for women to go with the guys on a business trip; *Id.* at 41-42.

- Vella told Reed "it was a man's world, and if women didn't like it, they could leave;" *Id.* at 47.

- In response to the handling of a suicidal female employee Vella stated "what she should have done was gave the woman a gun and let her shoot herself...[t]hat's how you handle a woman like that;" *Id.* at 48.

- Vella told Plaintiff that if she could not do her job without contacting MNP that he would replace her with a male contractor and "it would be over;" *Id.* at 49.

- Vella refused to allow Plaintiff to run cable as her job requires because she is a female - a man was called in to do the job; *Id.* at 50.

If Plaintiff's claim for a hostile environment rested solely on the offensive comments

outlined above, the evidence would be insufficient to support a finding that they were severe or pervasive enough to create an objectively hostile environment. See *Burnett v. Tyco Corporation*, 203 F.3d 980 (6th Cir. 2000)(two vulgar comments and placing a pack of cigarettes in the plaintiff's bra strap insufficient to establish a hostile environment); and *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997)(repeated use of vulgar and sexual comments at work meetings insufficient to establish a hostile environment). However, Plaintiff alleges more than just vulgar and offensive comments. She also claims that Vella interfered with her ability to do her job. According to Plaintiff, she and another female employee, Cindy Larkin, asked to be allowed to attend an out of town business meeting with Honda that several male employees were attending. Plaintiff claims she "was setting up a new printer" and "didn't have the information to do that job." [Plaintiff's Exhibit A, p.41]. Plaintiff wanted to attend the trip because she "needed the information from Honda." *Id.* According to Plaintiff, Larkin also needed information from Honda to do her job. *Id.* Vella denied the request and allegedly stated "it's not appropriate for the women to go with the guys." [Plaintiffs' Exhibit A, pp.41-42]. In addition to denying Plaintiff's request to attend the meeting, Plaintiff also alleges that Vella would not let her perform a part of her job because she is female. Plaintiff claims that she was not allowed to run cable through the ceiling at Ovidon, despite being certified to do so, because she was female. [Plaintiffs' Exhibit A, p.50]. She claims a male contractor was called in to do it.

Plaintiff submits evidence that she was denied the opportunity to attend out of town training that male employees were allowed to attend; that she was prevented from doing portions of her job that she was qualified to do; and that she was subjected to the comments outlined above, all within the eight months she worked under Vella. Accepting Plaintiff's evidence as

true, as the Court must, these allegations are sufficient to create a fact issue regarding whether the environment at Ovidon altered the conditions of Plaintiff's employment and created an abusive working environment.

### 3. Element Five - Employer Liability

The fifth element differs between Title VII and ELCRA claims. As noted above, under Title VII, an employer is strictly liable for actionable hostile work environment created by a supervisor with immediate authority over the employee. *Clark*, 400 F.3d at 348. Thus, the fifth element regarding vicarious liability is automatically established if the harassment is by a supervisor. However, if the harassment did not result in a negative tangible employment action, the employer has an available affirmative defense. *Id.* "To avail itself of the affirmative defense, the employer must show by a preponderance of the evidence that (a) 'the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808 (1998)).

It is undisputed that Vella was Plaintiff's direct supervisor. Accordingly, the fifth element of Plaintiff's hostile environment claim under Title VII is automatically established. The parties did not address whether Defendants may assert an affirmative defense, therefore the Court does not rule on the matter at this time.

With respect to Plaintiff's ELCRA hostile environment claim, the fifth element is not automatically established. Plaintiff must establish that Defendants failed to take prompt and adequate remedial action upon notice of the creation of a hostile work environment. *Chambers*,

463 Mich. at 312. Defendants assert they did not have notice of the alleged harassment committed by Vella and Plaintiff does not offer evidence that she gave actual notice of the alleged harassment by Vella. Plaintiff does not argue that based on the totality of the circumstances, a reasonable employer would have been aware of "a substantial probability that sexual harassment was occurring." *Id.* at 319. Accordingly, Plaintiff fails to establish the fifth element of her ELCRA hostile environment claim and Defendants are entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part, and **DENIES** in part, Defendants' Motion for summary judgment. Defendants' Motion is granted with respect to Plaintiff's claims: (1) against MNP Corporation; (2) of disparate treatment in violation of Title VII and the ELCRA; (3) of retaliation in violation of Title VII and the ELCRA; and (4) hostile environment in violation of the ELCRA. Based on the evidence presented, Defendants' Motion is denied with respect to Plaintiff's claim of a hostile environment in violation of Title VII.

**IT IS SO ORDERED.**

**s/Sean F. Cox**
**Sean F. Cox**
**United States District Judge**

**Dated: April 24, 2008**

**I hereby certify that a copy of the foregoing document was served upon counsel of record on April 24, 2008, by electronic and/or ordinary mail.**

**s/Jennifer Hernandez**
**Case Manager**